**FILED UNDER SEAL**

1  Julian Brew (SBN 150615)
   jbrew@hechtpartners.com
2  **HECHT PARTNERS LLP**
3  6420 Wilshire Boulevard, 17th Floor
   Los Angeles, CA 90048
4  Telephone: 310-804-8065
5  Facsimile: 646-492-5111
   Attorneys for Plaintiff-Relator,
6  **RELATOR LLC**

7

**FILED**

**FEB 20 2024**

CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA  C

8              **UNITED STATES DISTRICT COURT**
9            **NORTHERN DISTRICT OF CALIFORNIA**

10                                            **CV24  1001**

11  **UNITED STATES OF AMERICA,**      Case No.                **RFL**

12         Plaintiff,

13  *ex rel.* **RELATOR LLC**, a California      **COMPLAINT FOR VIOLATIONS**
14  limited liability company,              **OF FEDERAL FALSE CLAIMS**
                                           **ACT**
15         Relator,
                                           **FILED *IN CAMERA* UNDER SEAL**
16     v.                                  **PURSUANT TO 31 U.S.C. §**
17                                         **3730(b)(2)**
18  **JAMES S. PAPE,** an individual;
    **JEANNE DIBELLA**, an individual; and    **DO NOT PLACE ON PACER**
19  **THE ARCTICOM GROUP, LLC**, a
20  Delaware limited liability company, and    **JURY TRIAL DEMANDED**
    **DOES 1-10,**
21
22         Defendants.
23

24

25

26

27

28

COMPLAINT

**FILED UNDER SEAL**

1   Plaintiff RELATOR LLC ("Plaintiff") complains of James S. Pape, an
2   individual, Jeanne DiBella, an individual, The Arcticom Group, LLC ("TAG LLC"),
3   a Delaware limited liability company, and DOES 1-10.

4   ## JURISDICTION & VENUE

5   1.   This Court has subject matter jurisdiction over the Plaintiff's claims
6   brought under the FCA, 31 U.S.C. §§ 3279, et seq., pursuant to 31 U.S.C. §§ 3730
7   and 3732. This Court has supplemental jurisdiction to entertain the common law and
8   equitable causes of action under 28 U.S.C. § 1367(a).

9   2.   Plaintiff The United States of America is also located in the Northern
10   District of California. This Court has personal jurisdiction over Defendants pursuant
11   to 31 U.S.C. § 3732(a) because at all times material hereto, Defendants transacted
12   business and are located in the Northern District of California, and acts proscribed
13   by 31 U.S.C. § 3729 occurred in this district.[1]

14   3.   Venue is proper in this district pursuant to 31 U.S.C. § 3732(a), and
15   under 28 U.S.C. §§ 1391(b) and 1395(a), because the Defendant's acts that form the
16   basis of this Complaint occurred in the Northern District of California.

17   4.   Relator's claims and this Complaint are not based upon prior public
18   disclosures of allegations or transactions in a federal criminal, civil, or administrative
19   hearing in which the Government or its agent is a party; in a congressional,
20   Government Accountability Office, or other federal report, hearing, audit, or
21   investigation; or from the news media. To the extent that there has been a public
22   disclosure unknown to Relator, it is the "original source" within the meaning of 31
23   U.S.C. § 3730(e)(4)(B) and/or the public disclosure is a result of Relator voluntarily
24   providing this information to the United States Government prior to filing this *qui*
25   *tam* action.

26

27
_____

28   [1] TAG LLC operates throughout California, and has its headquarters in Walnut Creek,
     California, in the Northern District of California.

2

**FILED UNDER SEAL**

## INTRODUCTION AND SUMMARY

5.     In this matter one of the largest commercial refrigeration and HVAC services companies in the country misappropriated millions of dollars from the US Federal government's Paycheck Protection Program ("PPP"). In order to obtain the loan, the Defendants submitted falsified loan documents to the SBA. Defendants made misstatements regarding their eligibility and falsified the number of employees that they had. Defendants did not have any economic need for the loan, they simply took advantage. In fact, the business was experiencing rapid growth and TAG LLC was rapidly acquiring its competition. Defendants had no economic need for payroll assistance, assuming the loan was used on payroll. Defendants falsified additional documents which were presented to the government to obtain total loan forgiveness, billing millions to the US taxpayer.

6.     The individual defendants used their commercial refrigeration business, TAG LLC, to apply for and receive a PPP loan totaling $9,534,400.00, purportedly to cover payroll costs. However, TAG LLC and the individual defendants who controlled TAG LLC:

    a.     Falsified loan eligibility;

    b.     Falsified business type and industry type;

    c.     Falsified its status as a "small business" concern as defined;

    d.     Falsified that is not a dominant business in its field;

    e.     Falsified number of jobs;

    f.     Falsified the use of the loans on authorized expenses;

    g.     Falsified the economic necessity for the loans; and

    h.     Falsified eligibility for loan forgiveness.

7.     <u>Falsified Number of Jobs Reported</u>. TAG LLC lied about being a small business, under 500 employees. TAG LLC grossly *underreported* its job numbers to avoid being disqualified. It has and had many more than 500 employees. In its loan applications TAG LLC deceptively claimed to have exactly 500 jobs. It is a fabricated

1    number which was falsely provided by Defendants to get below the 500-employee
2    threshold in order to qualify for the loan. TAG LLC is not a "small business" but
3    rather a large one with more than 1500 employees and annual revenues in excess of
4    $160 million. TAG LLC's own website page boasts that the company has more than
5    1500 employees. ZoomInfo shows that TAG LLC employs 800 people and has
6    annual revenue of $169.1 million.

7        8.    Falsified Loan Eligibility – Not a Small Business. TAG LLC was
8    ineligible to receive a PPP loan because it was not a small business. On its loan
9    application, TAG LLC certified that it employed "no more than the greater of 500
10   employees or, if applicable, the size standard in number of employees established by
11   the SBA in 13 C.F.R. 121.201 for the Applicant's industry." TAG LLC falsely
12   reported the number of employees as being "500", which just so happens to be the
13   maximum number of employees allowed for eligibility. 500 is the limit. Beyond this
14   500 number lies complete ineligibility. It is an all or nothing analysis. If they had
15   even a single more job, it would make them ineligible for a loan *for any amount*. So,
16   in order to cheat the maximum 500 rule, they falsely reported the number of jobs as
17   500 exactly.   They also applied for the near maximum loan amount allowed,
18   $9,534,400.00 (the maximum being $10,000,000.00). In falsely claiming they had
19   **exactly 500 employees**, TAG LLC claimed to have the maximum number of
20   employees allowable to be eligible for a PPP loan, while maximizing the amount they
21   could get. However, in truth TAG LLC had more than 500 employees and was
22   therefore ineligible, for any amount, because it was not a small business at the time
23   it applied for the loan. Furthermore, the SBA's size standard for businesses in TAG
24   LLC's self-proclaimed industry (NAICS Code 238210, Electrical Contractors and
25   Other Wiring Installation Contractors) was $16.5 million[2] as of the date TAG LLC's

26
27

28   [2] https://www.ecfr.gov/current/title-13/chapter-I/part-121

**FILED UNDER SEAL**

1   loan was approved[3], and Relator is informed and believes that TAG LLC's annual
2   receipts were well in excess of $16.5 million. Among other things, it is clear from
3   TAG LLC's stated payroll of $9,534,400.00 for 2.5 months of salaries that the annual
4   receipts of TAG LLC were far in excess of the $16.5 million maximum. Specifically,
5   TAG LLC certified that 100% of the $9.5 million plus loan was to be used for payroll,
6   which under the PPP and CARES Act rules equates to two and one-half (2 ½) months
7   of salaries, which annualized is equal to annual salaries totaling more than $45
8   million.[4] Therefore, unless TAG LLC operated at a more than $36 million loss when
9   it applied for the loan, it had annual receipts in excess of the $16.5 million size
10  standard applicable for NAICS Code 238210, Electrical Contractors and Other
11  Wiring Installation Contractors. Therefore, TAG LLC was not and *could not* have
12  been a small business and was not eligible to apply for and receive the PPP Loan.
13  Furthermore, TAG LLC could not qualify under the "alternative size standard" since
14  TAG LLC had a tangle net worth in excess of $15 million as of March 27, 2020.

15      9.      Small business concerns can be eligible borrowers even if they have more
16  than 500 employees, as long as they satisfy the existing statutory and regulatory definition
17  of a "small business concern" under section 3 of the Small Business Act, 15 U.S.C. 632. 15
18  U.S. Code § 632 (a) (1) generally defines small business concerns as businesses which are
19  "not dominant in its field of operation." Before, during and after the pandemic TAG LLC
20  displayed its clear dominance in the field by repeatedly acquiring its competition and
21  becoming one of the largest commercial refrigeration and HVAC servicing companies in
22  the entire country. As one of the most prolific and financially lucrative businesses in its
23  area, it is and was *dominant in its field*. Therefore, it falsely certified that it fits within the
24  definition of a small business concern because a small business for this loan must not be

25  [3] The size standards themselves are expressed either in number of employees or annual
26  receipts in millions of dollars, unless otherwise specified. The number of employees or
    annual receipts indicates the maximum allowed for a concern and its affiliates to be
27  considered small.

28  [4] Calculation is equal to Loan Amount times 4.8.

FILED UNDER SEAL

1  dominant in its field. These loans are intended for companies in financial trouble, not
2  companies who do not need any assistance.

3      10.    No Economic Necessity. The PPP was made to help struggling
4  businesses which were unsure about being *able* to pay their workers. The second
5  certification in the application was: "Current economic uncertainty makes this loan
6  request necessary to support the ongoing operations of the Applicant." The word
7  "necessary" is important. The SBA required that the COVID pandemic caused
8  enough economic uncertainty such that company payroll was jeopardized. That is a
9  distinct standard. It is not enough that there was some economic uncertainty. The
10 uncertainty must be adverse enough to threaten payroll. There must be sufficient
11 economic uncertainty, such that the company's engine room and most important
12 asset, its people, were threatened with economic troubles. In other words, the
13 business must be on life support. The business must have been in trouble to the point
14 where its most important resource, its people, were not affordable any longer. The
15 PPP was not a free excuse to raid government coffers by wealthy businessmen. TAG
16 LLC did not need the loans -- there was no "need" or "economic necessity" to pay
17 Defendant's payroll expenses.[5] TAG LLC did not and cannot show any decline in
18 revenue during the pandemic, much less a decline so bad it threatened worker pay.
19 Furthermore, TAG LLC received more than $150 million in debt and equity capital
20 from Backcast Partners, a provider of debt and equity capital, in order to engage in a
21 massive shopping spree acquiring a dozen other HVAC companies. This ultimately
22 resulted in a highly lucrative sale of TAG LLC to a private equity group netting each
23 of Pape and DiBella millions of dollars. Dave Petrucco, managing partner at Backcast
24 stated of the TAG LLC deal "[w]e were able to help TAG aggressively grow right

25

26 [5] TAG LLC was not a small business in dire financial straits, but rather a well-financed
   company. Public information shows their revenue was not declining, and their own
27 statements indicate massive growth and profits. Defendant cannot show "economic
   necessity" in needing the loans to continue business operations.
28

**FILED UNDER SEAL**

1  through COVID-19 and create a fantastic company. TAG became one of the larger
2  investments we have ever made and was clearly one of the best investments we have
3  ever made." Despite their access to capital, their massive growth "right through
4  COVID-19," and their clear and undeniable economic resilience and success,
5  Defendants falsely certified they had "economic uncertainty" so they could take
6  financial assistance from the US taxpayer.

7       11.    No Economic Necessity – *TAG LLC's Enormous Financial Success*
8  *During the* COVID-19 Pandemic. It was evident from the onset of the pandemic that
9  some commercial refrigeration and HVAC service companies, like TAG LLC, would
10  thrive financially during the pandemic, and therefore TAG LLC could not in good
11  faith make the Economic Necessity Certification. This was evident with respect to
12  TAG LLC for a number of reasons at the onset of the pandemic, including, their
13  thriving customer base of large, chain grocery stores, and its substantial line of credit.
14  One of the primary customer types for TAG LLC were large, chain grocery stores,
15  which were deemed essential businesses during the pandemic. Unlike numerous
16  industries that faced closures or severe setbacks, grocery stores experienced
17  unprecedented demand, as people sought to secure their essential supplies. This surge
18  in demand for groceries inevitably led to increased business for commercial
19  refrigeration and HVAC servicing companies like TAG LLC. TAG LLC became
20  aware early on of its now even more critical role in maintaining the operational
21  efficiency and safety of grocery store refrigeration systems, ensuring uninterrupted
22  access to fresh produce, dairy, and other perishable items. Consequently, TAG LLC's
23  client base remained robust throughout the pandemic, providing a solid foundation
24  for their financial success. TAG LLC's financial stability during the pandemic was
25  further clear and evidenced by their shrewd use of a $150 million debt and equity line
26  of credit, which was in place prior to TAG LLC's receipt of the PPP Loan.
27  Recognizing the immense opportunities the pandemic presented, TAG LLC
28  capitalized on their access to these funds to acquire several competitors in the market.

**FILED UNDER SEAL**

By expanding their market share through strategic acquisitions, they not only solidified their position as an industry leader but also enhanced their capacity to serve a broader customer base. This approach allowed TAG LLC to leverage economies of scale, optimize their operations, and further increase profitability. The nearly $10 million PPP Loan only further enhanced their financial success and padded their profits. In December 2021, TAG LLC's executives, James Pape and Jeanne DiBella, capitalized on the company's impressive performance by selling it to a private equity sponsor at a substantial profit. The outstanding financial results achieved by TAG LLC during the pandemic solidified its position as an attractive investment opportunity. The robust customer base, bolstered by the steady demand from essential businesses, alongside the strategic acquisitions and subsequent market expansion, significantly increased TAG LLC's value. TAG LLC did not have a legitimate economic necessity for the PPP Loan. This was clear at the beginning of the pandemic. It was clear when they applied for the Loan and it was clear when they applied for loan forgiveness. The US taxpayer was taken advantage of, so that a handful of executives could make millions of dollars each.

12.    <u>Money Not Returned</u>. The loan was taken by a business which was not allowed to take even one penny in loans, let alone millions of dollars. However, at some point the defendants could have changed course. They could have returned the money. They did not. They doubled down on their misappropriation by seeking loan forgiveness. The more than $9.5 million in funds should have been returned immediately. This loan should never have been sought in the first place. Yet the Defendants went further by obtaining total loan forgiveness, billing the US taxpayers millions of dollars. *Defendants have not returned the loan proceeds to this day.*

13.    <u>Further Falsification on Loan Forgiveness</u>. Defendants falsified further documents to receive loan forgiveness. Defendants had to attest as to the use of the funds and the amount used on authorized purposes. They were not because Defendants could not comply with the requirements of forgiveness given their

COMPLAINT

**FILED UNDER SEAL**

1  business type. So, Defendants also lied on their forgiveness documents and
2  application.

3       14.    Defendant's False Statements and Fraud. Defendants knowingly and
4  intentionally made many materially false statements to the government and bank to
5  obtain the loans.

6       15.    Plaintiff brings this action as relator on behalf of the United States to
7  recover treble damages, civil penalties, and costs under the False Claims Act
8  ("FCA"), 31 U.S.C. §§ 3729-33 Plaintiff gave notice of its intent to file and full
9  disclosure of the evidentiary basis to the Department of Justice ("DOJ").

10                                **THE PARTIES**

11       16.    Plaintiff is a California limited liability company with its principal
12  place of business in Los Angeles County, California.

13       17.    Defendant James S. Pape is an individual and, at all relevant times
14  herein, is and was the Chief Executive Officer of TAG LLC.

15       18.    Defendant Jeanne DiBella is an individual and, at all relevant times
16  herein, is and was the Chief Financial Officer of TAG LLC.

17       19.    Defendant TAG LLC is a Delaware limited liability company with its
18  principal place of business located at 1676 N California Blvd, Suite 550, Walnut
19  Creek, California 94596.

20       20.    TAG LLC is one of the largest commercial refrigeration and HVAC
21  servicing companies in the country.

22       21.    The true names and capacities, whether individual, partner, associate,
23  corporate or otherwise, of Defendant DOES 1 through 10, inclusive, and each of
24  them, are unknown to Plaintiff, who therefore sues said Defendant(s) by such
25  fictitious names. Plaintiff is informed and believes and thereon alleges that each
26  Defendant designated herein as a "DOE" is legally responsible in some manner for
27  the events and happenings herein mentioned. Plaintiff will seek leave of Court to
28  amend this Complaint to reflect the true names and capacities of said DOES, and add

**FILED UNDER SEAL**

1  appropriate charging allegations against said DOES when their identities have been
2  ascertained. Plaintiff is informed and believes that each of the DOE Defendants were
3  responsible in some manner for the injuries and damages alleged herein, and/or for
4  the wrongful acts of some or all of the Defendants.

5      22.    Plaintiff is further informed and believes that each of the Defendants,
6  whether specifically named or named as a DOE, was an agent, employee, servant
7  and/or representative of each of the remaining Defendants, and, in doing or failing to
8  do the things alleged herein, was acting within the course and scope of said agency,
9  employment, service and/or representation.

10      23.    Plaintiff is further informed and believes that each of the Defendants,
11  whether specifically named herein or named as a DOE, approved, ratified and/or
12  acquiesced in the acts and omissions of each of the remaining Defendants.

13      24.    Plaintiff is further informed and believes that each of the Defendants
14  herein, whether named as DOES or otherwise, acted in concert, agreement and
15  conspiracy with the other Defendants for the common purpose of engaging in a
16  scheme to defraud as alleged below.

17          **THE CARES ACT AND PAYCHECK PROTECTION PROGRAM**

18      25.    On March 27, 2020, the Coronavirus Aid, Relief, and Economic
19  Security Act ("the CARES Act" or "the Act") (Pub. L. 116-136) became law and
20  provided emergency assistance and health care response for eligible individuals,
21  families, and businesses affected by the coronavirus pandemic. SBA received
22  funding and authority through the Act to modify existing loan programs and establish
23  a new loan program to assist small businesses nationwide adversely impacted by the
24  COVID-19 emergency.

25      26.    The CARES Act authorized loans to eligible small businesses struggling
26  to pay employees and stay in business as a result of the devastating effect of the
27  COVID-19 pandemic and resulting restrictions.

28      27.    Section 1102 of the CARES Act temporarily permitted the SBA to

**FILED UNDER SEAL**

1   guarantee 100 percent of 7(a) loans under a new program titled the "Paycheck
2   Protection Program" ("PPP").

3      28.     On April 24, 2020, the Paycheck Protection Program and Health Care
4   Enhancement Act (Pub. L. 116-139) was enacted to provide additional funding and
5   authority for the PPP. On June 5, 2020, the PPP Flexibility Act of 2020 (Flexibility
6   Act) (Pub. L. 116-142) was enacted, changing key provisions of the PPP, including
7   provisions relating to the maturity of PPP loans, the deferral of PPP loan payments,
8   and the forgiveness of PPP loans.

9      29.     Under the PPP, in 2020, eligible businesses could obtain one SBA
10   guaranteed PPP loan. Businesses were required to spend all loan proceeds only for
11   employee compensation, rent or mortgage, and certain other specified expenses.
12   Depending on their use of the loan proceeds as certified, they could qualify for loan
13   forgiveness, up to the full amount of the loan.

14      30.     The SBA delegated authority to third-party lenders to underwrite and
15   approve the PPP loans. In order to obtain a PPP loan, whether a "First Draw" or
16   "Second Draw" loan, an eligible business (through its authorized representative) had
17   to sign and submit a PPP loan application (SBA Form 2483) online through the
18   lender's platform. The PPP loan application (SBA Form 2483) required the business
19   (through its representative) to acknowledge the PPP program rules and make certain
20   certifications in order to be eligible to obtain the PPP loan, including certifying that
21   their certifications were true.

22      31.     Once the Borrower submitted its PPP loan application (SBA Form 2483)
23   to a Lender, the participating lender processed the PPP loan application. If a PPP loan
24   application (SBA Form 2483) was approved by the lender, it funded the PPP loan
25   with its own funds, which were 100% guaranteed by the SBA.

26      32.     After the Lender processed and approved a borrower's PPP loan
27   application (Form 2483), but prior to the closing of the PPP loan, the Lender
28   submitted to the SBA, the Lender's Application - Paycheck Protection Program Loan

FILED UNDER SEAL

1   Guaranty (SBA Form 2484) to the SBA applying for a guarantee on the loan. For a

2   PPP loan to be approved, the Lender was required to Answer Yes to the following

3   questions in the Lender's Application - Paycheck Protection Program

4   Loan Guaranty (SBA Form 2484) as to the Borrower's certification of its General

5   Eligibility to receive a PPP Loan:

| | |
|---|---|
| • The Applicant has certified to the Lender that (1) it was in operation on February 15, 2020, has not permanently closed, and was either an eligible self-employed individual, independent contractor, or sole proprietorship with no employees or had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on Form(s) 1099MISC; (2) current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant; (3) the funds will be used to retain workers and maintain payroll, or make payments for mortgage interest, rent, utilities, covered operations expenditures, covered property damage costs, covered supplier costs, and covered worker protection expenditures; and (4) the Applicant has not and will not receive another loan under the Paycheck Protection Program, section 7(a)(36) of the Small Business Act (15 U.S.C. 636(a)(36)) (this does not include Paycheck Protection Program second draw loans, section 7(a)(37) of the Small Business Act (15 U.S.C. 636(a)(37)). | ☐ Yes    ☐ No |

22       SBA Form 2484 (emphasis added). Therefore, if a PPP borrower lied on its

23   PPP loan application (SBA Form 2483), the PPP borrower's false certification caused

24   the Lender to submit to the SBA with respect to that PPP Loan, a Lender's

25   Application - Paycheck Protection Program Loan Guaranty (SBA Form 2484) that

26   contained the PPP borrower's False Statement.

27       33.   SBA Form 2483 includes the following certification, among others: "I

28   have read the statements included in this form, including the Statements Required by

COMPLAINT

**FILED UNDER SEAL**

1  Law and Executive Orders, and I understand them" (the "Understanding
2  Certification").

3       34.    SBA Form 2483 also includes the following certification, among others:
4  "The Applicant is eligible to receive a loan under the rules in effect at the time this
5  application is submitted that have been issued by the Small Business Administration
6  (SBA) implementing the Paycheck Protection Program under Division A, Title I of
7  the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) (the Paycheck
8  Protection Program Rule)" (the "Eligibility Certification").

9       35.    SBA Form 2483 also includes the following certification, among others
10  "All SBA loan proceeds will be used only for business-related purposes as specified
11  in the loan application and consistent with the Paycheck Protection Program Rule"
12  (the "Use of Proceeds Certification").

13       36.    SBA Form 2483 also includes the following certification, among others:
14  "Current economic uncertainty makes this loan request necessary to support the
15  ongoing operations of the Applicant" (the "Economic Necessity Certification").

16       37.    SBA Form 2483 also includes the following certification, among others:
17  "The funds will be used to retain workers and maintain payroll or make mortgage
18  interest payments, lease payments, and utility payments, as specified under the
19  Paycheck Protection Program Rule; I understand that if the funds are knowingly used
20  for unauthorized purposes, the federal government may hold me legally liable, such
21  as for charges of fraud" (the "Worker Retention and Payroll Certification").

22       38.    SBA Form 2483 also includes the following certification, among others:
23  "During the period beginning on February 15, 2020 and ending on December 31,
24  2020, the Applicant has not and will not receive another loan under the Paycheck
25  Protection Program." (the "Single Loan Certification").

26       39.    SBA Form 2483 also includes the following certification, among others:
27  "I further certify that the information provided in this application and the information
28  provided in all supporting documents and forms is true and accurate in all material

1  respects. I understand that knowingly making a false statement to obtain a guaranteed
2  loan from SBA is punishable under the law, including under 18 USC 1001 and 3571
3  by imprisonment of not more than five years and/or a fine of up to $250,000; under
4  15 USC 645 by imprisonment of not more than two years and/or a fine of not more
5  than $5,000; and, if submitted to a federally insured institution, under 18 USC 1014
6  by imprisonment of not more than thirty years and/or a fine of not more than
7  $1,000,000" (the "No False Statements Certification").

8      40.    After the borrower submitted a PPP loan application, it was processed
9  by the participating lender. If the PPP loan application was approved, the
10  participating lender funded the loan using its own monies, which were then
11  guaranteed by the SBA. Generally, in the event the borrower defaulted on a PPP loan,
12  the SBA would purchase the borrower's debt from the lender and be responsible for
13  its repayment.

14      41.    Under applicable SBA rules and guidance, recipients of PPP loans could
15  apply to have principal and interest on the PPP loan fully forgiven, meaning that the
16  borrower would owe nothing and would have no obligation to repay the PPP loan.
17  To obtain full forgiveness of the PPP loan, borrowers had to attest that they had "not
18  reduced the number of employees or the average paid hours of [their] employees"
19  during the loan period, that the loan proceeds had been spent on payroll costs and
20  other permitted expenses and that at least 60% of the loan proceeds had been spent
21  on payroll costs (hereafter the "Loan Forgiveness Certification").

22      42.    Loans could only be used for certain permitted expenses, such as to pay
23  employees' salaries, employee benefits, mortgage interest, rent, utilities or worker
24  protection costs related to COVID19.

25      43.    More specifically, the loan forgiveness application (SBA Form 3508),
26  revised as of July 30, 2021, included the following certifications, among others:

27          (1)    The dollar amount for which forgiveness is requested:

28              ▪ was used to pay costs that are eligible for forgiveness (payroll

**FILED UNDER SEAL**

costs to retain employees; business mortgage interest payments; business rent or lease payments; or business utility payments);

- includes all applicable reductions due to decreases in the number of full-time equivalent employees and salary/hourly wage reductions;

- includes payroll costs equal to at least 60% of the forgiveness amount;

- if a 24-week Covered Period applies, does not exceed 2.5 months' worth of 2019 compensation for any owner-employee or self-employed individual/general partner, capped at $20,833 per individual; and

- if the Borrower has elected an 8-week Covered Period, does not exceed 8 weeks' worth of 2019 compensation for any owner-employee or self-employed individual/general partner, capped at $15,385 per individual.

(2)     I understand that if the funds were knowingly used for unauthorized purposes, the federal government may pursue recovery of loan amounts and/or civil or criminal fraud charges.

(3)     The Borrower has accurately verified the payments for the eligible payroll and nonpayroll costs for which the Borrower is requesting forgiveness.

(4)     The Borrower's eligibility for loan forgiveness will be evaluated in accordance with the PPP regulations and guidance issued by SBA through the date of this application.

44.     On April 23, 2020 in FAQs No. 31, the SBA reiterated that the economic necessity certification must be made in good faith and that publicly traded companies are not likely to be able to make that certification in good faith, stating "it is unlikely that a public company with substantial market value and access to capital markets

**FILED UNDER SEAL**

1   will be able to make the required certification in good faith…"

2   **DEFENDANTS' FRAUD**

3   45.     During round 1 of the PPP, Defendant TAG LLC applied for a PPP loan
4   for $9,534,400.00. It was approved on April 29, 2020, by the SBA for the full amount,
5   which was disbursed. The loan was facilitated by Zions Bank. Defendant received
6   100% of the approved amount. On its application for this loan, Defendant stated that
7   it had *exactly 500* employees for which it needed the loan, the maximum number
8   before sized out of eligibility altogether. This loan was forgiven on June 11, 2021.

9   46.     TAG LLC is expressly prohibited from receiving SBA loans, including
10  PPP loans because TAG LLC was not a "small-business concern" and did not satisfy
11  any of the alternate tests to make it eligible to receive a PPP loan. TAG LLC's CEO
12  and CFO were sophisticated and experienced business people. They knew about the
13  restrictions. The legal and financial experts they had hired over the years would have
14  known this. The Defendants intentionally broke these clear rules knowing what they
15  were doing. The individual defendants successfully operated the commercial
16  refrigerator and HVAC servicing company and would have had to manage and
17  investigate the many regulations encountered along the way. They would have
18  quickly discovered that the PPP Loan was not permitted, especially given the
19  amounts involved and the expertise and capabilities of the people working TAG LLC.

20  47.     The Defendants knew when they claimed that TAG LLC had 500
21  employees that such a statement was false. TAG LLC did not have *exactly 500*
22  *employees*, they had substantially more than 500 employees and if the true and
23  correct number of their employees was reported by defendants, TAG LLC would not
24  be eligible to obtain a PPP loan, because it would not be a small business. If TAG
25  LLC had more than 500 employees they could not conceivably qualify as a small
26  business under the size standard principal. Specifically, the maximum amount of
27  annual receipts that TAG LLC could receive and continue to qualify as a small
28  business was $16.5 million as of the date TAG LLC's loan was approved. The

**FILED UNDER SEAL**

1   annualized salaries of TAG LLC's more than $9.5 million loan for 2.5 months of
2   employee wages would equate to an amount of annual salaries equal to more than
3   $45 million, which means that either TAG LLC operated at an $36 million dollar loss
4   when it applied for the loan, or it had annual receipts in excess of the $16.5 million
5   size standard applicable and was therefore not eligible to receive the PPP Loan.

6      48.    In addition to applying any applicable business type ineligibility rules,
7   all borrowers should carefully review the required Economic Certainty certification
8   on the Borrower Application Form stating that ''[c]urrent economic uncertainty
9   makes this loan request necessary to support the ongoing operations of the
10  Applicant.''

11     49.    TAG LLC abused the PPP program, from misrepresenting its economic
12  need for the loan to willfully ignoring its ineligibility, to maximizing the amount of
13  the loan and then obtaining loan forgiveness. Discovery will reveal where the
14  millions in PPP funds were actually spent, but what is obvious is that Defendants *did*
15  *not need any money from US taxpayers*. TAG LLC is and was highly profitable
16  during the pandemic, just like most in their industry. TAG LLC did not suffer any
17  business loss and certainly had the money to pay their own worker wages.

18     50.    Defendants signed the loan applications, thereby endorsing the
19  Understanding Certification, which means that they agreed that they understood the
20  rules and guidelines of the PPP, including, without limitation the rules regarding use
21  of proceeds and the certifications made.

22     51.    The proceeds of the PPP Loans were not and could not have been used
23  only for authorized purposes consistent with the PPP Rule, because, among other
24  things, the Defendant was obviously not allowed to apply for PPP loans because of
25  [their ready access to money as a publicly traded company and] their company size,
26  more than 500 employees. Therefore, when Defendants made the Use of Proceeds
27  Certification, the certification was false.

28     52.    The proceeds of the PPP Loans were not necessary to support the

**FILED UNDER SEAL**

1    ongoing operations of TAG LLC. The company was nowhere near a financial
2    precipice. Far from it. The company enjoyed record high business achievements since
3    2020 until today. This company had considerable financial resources to pay its own
4    workers, assuming that is where the money was spent rather than into the pocket of
5    the CEO and its executives. Therefore, when Defendants made the Economic
6    Necessity Certification, the certification was false.

7    53.    The PPP loan money was only allowed to be used on *authorized*
8    expenses. The proceeds of the PPP Loan were not permitted to be used to pay for the
9    very much affordable business costs for this large publicly traded business with
10    access to billions of dollars in public funding, therefore when Defendant made the
11    Worker Retention and Payroll Certification, the certification was false.

12    54.    By virtue of the above false statements, when Defendants made the No
13    False Statements Certification, that certification was false.

14    55.    The Defendants actively pursued and obtained loan forgiveness.
15    Because TAG LLC is prohibited from obtaining any PPP loans, its representation on
16    its forgiveness application that it spent 100% of the loan proceeds on eligible
17    expenses was not truthful. The SBA would not have forgiven the loans if they knew
18    Defendants' certifications described above were false. They also would not have
19    forgiven the loans if they knew the proceeds had been used to increase profits instead
20    of paying their employees.

21    56.    As a result of the forgiveness, Defendants have not repaid the loan and
22    have kept the proceeds, and the loan has been repaid with money from taxpayers,
23    including the small businesses and owners who were supposed to receive the PPP
24    funds instead of repaying a profitable [type of business]'s loan that it never should
25    have received, let alone had forgiven.

26    **THE FALSE CLAIMS ACT**

27    57.    The False Claims Act prohibits fraudulent conduct in connection with
28    federal programs, including the knowing submission of false claims for payment to

1 the government. See 31 U.S.C. § 3729(a)(1)(A). In these circumstances, liability may
2 attach if the omission renders those representations misleading. 41. 31 U.S.C. §
3 3729(a)(1)(A) and (B) of the FCA provide that:

4     (1) . . . any person who—

5     (A) knowingly presents, or causes to be presented, a false or fraudulent
6 claim for payment or approval; [or]

7     (B) knowingly makes, uses, or causes to be made or used, a false
8 record or statement material to a false or fraudulent claim,

9     . . .

10     (G) knowingly makes, uses, or causes to be made or used, a false
11 record or statement material to an obligation to pay or transmit money or property to
12 the Government, or knowingly conceals or knowingly and improperly avoids or
13 decreases an obligation to pay or transmit money or property to the Government, is
14 liable to the United States Government . . .

15     31 U.S.C. § 3729(a)(1)(A), (B), and (G) (2020).

16     42. The scope of a false or fraudulent claim is to be broadly construed.
17 As used in the FCA, a "claim"

18     (A) means any request or demand, whether under a contract or
19 otherwise, for money or property and whether or not the United States has title to the
20 money or property, that—

21     (i) is presented to an officer, employee, or agent of the United States;
22 or

23     (ii) is made to a contractor, grantee, or other recipient, if the money or
24 property is to be spent or used on the Government's behalf or to advance a
25 Government program or interest, and if the United States Government—

26     (I) provides or has provided any portion of the money or property
27 requested or demanded; or

28     (II) will reimburse such contractor, grantee, or other recipient for any

**FILED UNDER SEAL**

1    portion of the money or property which is requested or demanded; . . .

2              31 U.S.C. § 3729(b)(2) (2020).

3         58.    A person who violates the False Claims Act during the time period at

4    issue "is liable for a civil penalty as adjusted, plus 3 times the amount of damages

5    which the United States Government sustains because of the act of that person." 31

6    U.S.C. § 3729(a). See 28 C.F.R. § 85.3(a)(9); Department of Justice, 28 CFR Part

7    85, Civil Monetary Penalties Inflation Adjustments for 2022 published at:

8    https://www.govinfo.gov/content/pkg/FR-2022-05-09/COMMERCE/2022-

9    09928.COMMERCE.

10                        **FIRST CAUSE OF ACTION**

11    **FALSE OR FRAUDULENT CLAIMS (31 U.S.C. § 3729(a)(1)(A-B))**

12        59.    Plaintiff alleges and incorporates by reference each and every allegation

13    contained in all prior paragraphs of this complaint.

14        60.    This is a claim for treble damages and penalties under the False Claims

15    Act, 31 U.S.C. § 3729, et seq., as amended.

16        61.    By virtue of the acts described above, Defendants knowingly presented,

17    or caused to be presented, to an officer or employee of the United States government,

18    false or fraudulent claims for payment or approval, in violation of the FCA, 31 U.S.C.

19    § 3729(a)(l)(A). Specifically, each of Defendants' Economic Necessity, No False

20    Statements, Eligibility, Use of Proceeds, Understanding, Worker Retention and

21    Payroll Certifications described above all were knowingly false, and relied upon by

22    lenders and the SBA in approving the PPP Loans.  Their request for forgiveness

23    contained a further misrepresentation that the loans had been used only for authorized

24    purposes.

25        62.    By virtue of the acts described above, Defendants knowingly made or

26    used, or caused to be made or used, false or fraudulent records or statements material

27    to false or fraudulent claims for payment by the Government.

28        63.    The Government and its agents and contractors relied on those false

                                    20

**FILED UNDER SEAL**

statements in approving and making the loans and subsequently forgiving them, leaving the burden of repayment on taxpayers.

64.    Because of the Defendants' acts, the United States sustained damages in an amount to be determined at trial and, therefore, is entitled to treble damages under the FCA, plus civil penalties of not less than $12,537.00 and not more than $25,076.00 for each and every violation arising from Defendants' unlawful conduct alleged herein, and attorneys' fees in an amount to be proven.

## CONCLUSION

65.    Defendants abused the PPP. The PPP was meant for businesses struggling to afford payroll. Now that program is dry, and many are out of work. The American people have a right to reconciliation.

### PRAYER FOR RELIEF

WHEREFORE, qui tam Plaintiff/Relator prays for judgment against Defendants, as follows:

1. That this Court enter judgment against each Defendant in an amount equal to three times the damages that the United States has sustained because of Defendants' action, plus a civil penalty of not less than $12,537.00 and not more than $25,076.00 for each and every false claim as are required by law, together with all such further relief as may be just and proper.

2. Such other relief as this Court may deem just and proper, together with interest and costs of this action.

3. Reasonable attorney fees, litigation expenses, and costs of suit.

FILED UNDER SEAL

1

## JURY DEMAND

2     Plaintiff demands a trial by jury on all issues so triable.

3

4   Dated: February 20, 2024         HECHT PARTNERS LLP

5

6

7                               By: _____

8                                   JULIAN BREW

                                     Attorneys for Plaintiff-Relator

9                                   RELATOR LLC

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

22

COMPLAINT